LAW OFFICE OF FELIX VINLUAN
Felix Q. Vinluan (FV6788)
69-10 Roosevelt Avenue, 2nd Floor
Woodside, NY 11377
Tel. No. 718-478-4488
Fax No. 718-478-4588
*Attorneys for the Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

ANILA SUAREZ,
        *Plaintiff,*

  - against -

FREEDA SCUDDER,
        *Defendant.*

-------------------------------------------------------------x

Docket No. _____

COMPLAINT
Trial by Jury

**PLAINTIFF** ANILA SUAREZ, by undersigned counsel, respectfully alleges as follows:

**PRELIMINARY STATEMENT**

1.    Plaintiff asserts a claim under the Trafficking Victims Protection Reauthorization Act (18 U.S.C. §1589 and 18 U.S.C. §1590) to recover compensatory and punitive damages arising from Defendant's unlawful conduct of forced labor.

2.    This action arises out of a scheme by which Defendant defrauded the Plaintiff through false representation on her visa sponsorship, and perpetuated said fraudulent scheme by threats of cancellation of her visa sponsorship and deportation.  Defendant induced the Plaintiff into relying on her representation that Plaintiff would be properly paid as her children's nanny in accordance with their employment contract submitted to the US Embassy in Abu Dhabi, United Arab Emirates. As a result, Plaintiff, despite being three and a half months pregnant, relied on this representation and agreed to come to New York to work as Defendant's domestic employee.

1

3.       When in New York, Plaintiff found herself working more than the agreed-upon work hours and getting paid so much less than the agreed-upon rate. She complained about her wages, but her complaints fell on deaf ears. Fortuitously, the fact of her just having given birth became her way to escape her forced labor. Defendant agreed to let Plaintiff bring her new-born baby to the Philippines.

4.       Not long after Plaintiff arrived in the Philippines, Defendant enticed her to come back to New York, using her children as reason as they allegedly needed Plaintiff to take care of them. Defendant likewise used her being a victim of domestic violence to bring Plaintiff back to New York. Defendant claimed that she needed Plaintiff to testify in her behalf regarding her domestic violence case against her husband. She also promised and represented that she would start paying Plaintiff the legal compensation rate.

5.       Relying on Defendant's representations and still possessing Defendant's B-1 visa sponsorship, Plaintiff returned to New York and resumed her domestic services for Defendant. But just like the first period of her employment in New York, she worked long hours and was not properly compensated. When she complained, Defendant threatened her with cancellation of her visa sponsorship, of being reported to immigration authorities and of being deported, and of being made a defendant in a civil action for possible breach of contract case.

6.       As a result of this threatened cancellation of her visa and her deportation, as well as of a possible lawsuit, Plaintiff remained in constant fear of the Defendant and believed she had no choice but to obey Defendant's orders and to continue working for her. Fortunately, she met some anti-trafficking and wage-hour advocates who informed her of her employment rights. Plaintiff eventually left her employment with Defendant and escaped her slavery-like working conditions.

7.      This matter is likewise a straightforward wage and hour case premised on Defendant's willful violations of the Fair Labor Standards Act (FLSA) and the New York Labor Law (NYLL).   Throughout Plaintiff's employment as a domestic employee, Defendant compensated Plaintiff only a total amount of $650. Yet, Plaintiff worked, on average, approximately between fifty (50) and one hundred five (105) hours per week.

8.      Defendant did not pay Plaintiff the statutorily-required minimum wage rates under the FLSA and the NYLL. Worse, Defendant also did not compensate Plaintiff at the NYLL-statutorily required rate of one and one-half times her regular rate of pay for any and all hours that Plaintiff worked per week in excess of forty-four.

9.      Defendant also failed to furnish Plaintiff with accurate and/or complete wage statements on each pay period, or with wage notice at the time of hire as required by the NYLL.

## JURISDICTION AND VENUE

10.     This is an action for damages arising under the Trafficking Victims Protection Reauthorization Act (TVPRA 0f 2003, amending the Trafficking Victims Protection Act) and/or the Fair Labor Standards Act (FLSA, 29 U.S.C. §§ 201 *et seq*.).

11.     This Court has supplemental jurisdiction over the related state and common law claims asserted herein under the doctrine of pendent jurisdiction and pursuant to 28 U.S.C. §1367.  Supplemental jurisdiction over those claims is appropriate because they arise from the same common nucleus of operative facts from which the federal claim arises.

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of New York.

## PARTIES

13.     Plaintiff  Anila Suarez ("Suarez" or "Plaintiff") is an adult individual residing in Queens County, state of New York.    She is a citizen of the Philippines.  She entered the United States to work as a nonimmigrant domestic employee of Defendant.

14.     Defendant Freeda Scudder ("Scudder" or "Defendant") is an adult individual who, upon information and belief, presently resides in New York County, state of New York.

15.     Plaintiff Suarez was employed by Defendant as a domestic employee and worked at Defendant's residence located in Nassau County, state of New York, and then later on at Defendant's apartment in Manhattan, New York City.

16.     At all times relevant to this action, Defendant was an "employer" of the Plaintiff within the meaning of the Fair Labor Standards Act (FLSA) and the New York Labor Law (NYLL).

17.     At all times relevant to this action, Plaintiff was an "employee" of Defendant within the meaning of the Fair Labor Standards Act and the New York Labor Law, and was a "manual worker" within the meaning of the New York Labor Law, § 191(1)(a).

18.     At all times relevant to this action, Plaintiff was engaged "in commerce or in the production of goods for commerce", within the meaning of the Fair Labor Standards Act, when she regularly and recurrently either engaged in commerce or handled or otherwise worked on goods or materials that had been moved in interstate commerce or produced for commerce, such as cleaning tools and supplies, and laundry equipment and supplies.

19.     Upon information and belief, Defendant had power over personnel decisions.

20.     Upon information and belief, Defendant had power over payroll decisions.

21.     Upon information and belief, Defendant had the power to hire and fire the Plaintiff, establish and pay her wages, set her work schedules and maintain her employment records.

22.     All of the acts alleged in this Complaint were authorized, ordered, and implemented by Defendant.

## STATEMENT OF FACTS

23.     Sometime in 2014, Plaintiff Suarez, while looking for a job in the United Arab Emirates, met the Scudder family.

24.     The Scudder spouses, Rahul and Freeda (Defendant herein), were, upon information and belief, United States citizens of Indian descent. They had three children who were aged 3, 5, and 10, at the time Plaintiff first met them.

25.     The Scudders hired the services of Plaintiff as part-time all-around nanny for their three children.

26.     On or about November 25, 2014, the Scudder couple offered Plaintiff full-time employment.

27.     In addition to taking care of the three children, Plaintiff did housekeeping chores for the Scudder family.

28.     Sometime in September 2016, the Scudder spouses began to live in separate residences. Plaintiff therefore had to clean two separate residences.

29.     Not long after her separation from her husband Rahul, Defendant Freeda Scudder went to the United States and brought her three children along with her.

30.     Defendant called up Plaintiff Suarez and asked her to join her in the United States to take care of her children. Defendant also informed Plaintiff that her husband, Rahul, would soon join her in the United States to work out their marital issues.

31.     Suarez was at first hesitant to work in the United States as she was then three and a half months pregnant.

32.     Defendant convinced Suarez to come to the United States by assuring and promising her that Plaintiff's husband would later on be sponsored too by the Scudder couple to come to the United States as well.

33.     With that assurance, Plaintiff Suarez agreed to be sponsored by the Defendant and to have her B-1 visa application processed so she could come to work for the Scudders in the United States.

34.     Defendant thereafter sent the paperworks for Plaintiff to submit to the U.S. Embassy in Abu Dhabi, United Arab Emirates in connection with her B-1 visa sponsorship application.

35.     One of the documents required by the U.S. Embassy for Defendant Scudder's B-1 visa sponsorship was a contract between Suarez and Defendant regarding the terms of Plaintiff's employment in the United States.

36.     In compliance with the U.S. Embassy's requirements, Defendant and Plaintiff entered into an employment agreement dated October 13, 2016 whereby Defendant promised to pay Suarez at least the minimum wage, which was $9.00 per hour at that time in New York, and that she would provide Suarez with private bedroom, food, personal hygiene items, and anything else necessary for Plaintiff to live commensurate U.S. living standards, and that Defendant would provide Suarez with the costs of round-trip ticket to where Suarez normally resided.

37.     Plaintiff Suarez relied upon Defendant Scudder's promises and representations as embodied in their employment agreement that she would be properly compensated in accordance with U.S. laws.

38.     On October 20, 2016, the U.S. Embassy issued Plaintiff her B-1 visa as a domestic employee of the Scudders.

39.     Defendant Scudder thereafter sent Plaintiff her ticket to come to the United States.

40.     On November 5, 2016, Plaintiff Suarez left the United Arab Emirates and arrived at the JFK Airport in New York where Defendant picked her up.

41.     Defendant brought Suarez to her apartment in Great Neck, New York, within the jurisdiction of the Eastern District Court of New York.

42.     As soon as Suarez arrived, Defendant made her perform her duties as an all-around nanny and household employee.

43.     Plaintiff Suarez did the laundry, cooked, and cleaned the whole Scudder apartment. In addition, she took care of the three young children, dressing them up and feeding them. She also ironed their clothes, cleaned the bedrooms and bathrooms, and took the garbage out. She cleaned the microwave oven, the refrigerator, the kitchen sink and the washing machine/dryer.

44.     Suarez's normal day with the Scudders started around 6:30 in the morning, when she cooked breakfast and prepared the table for all of them. Almost always, she also had to prepare extra food for Defendant Scudder to bring as lunch at her work. Suarez made sure the three children were fed and made ready to go to school. She brought them to the school parking grounds, and also made sure to pick them up later from school. Plaintiff's day would normally end past 9:30 p.m., after everybody had had dinner and after she had finished cleaning up the

kitchen and the mess around the apartment. On average, at least during the first few months of her employment, Plaintiff worked 15 hours a day, seven days a week, with no breaks or days off.

45.     As and by way of example of Plaintiff's regular work-week, Defendant required Plaintiff Suarez to perform domestic services and Plaintiff did perform work, as follows:

> Dec. 12, 2016 (Monday) – from 6:30 a.m. to 9:30 p.m.;
> Dec. 13, 2016 (Tuesday) – from 6:30 a.m. to 9:30 p.m.;
> Dec. 14, 2016 (Wednesday) – from 6:30 a.m. to 9:30 p.m.;
> Dec. 15, 2016 (Thursday) – from 6:30 a.m. to 9:30 p.m.;
> Dec. 16, 2016 (Friday) – from 6:30 a.m. to 9:30 p.m.;
> Dec. 17, 2016 (Saturday) – from 6:30 a.m. to 9:30 p.m.;
> Dec. 18, 2016 (Sunday) – from 6:30 a.m. to 9:30 p.m.

46.     Suarez definitely and regularly worked more than 44 hours per week at the Scudders' Great Neck residence as their domestic employee. Her domestic services included, but were not limited to, meal preparation and service, washing clothes, ironing clothes, doing errands outside the house, personal hygiene care and dressing up the children, performing general household cleaning, including mopping, vacuuming, and sweeping the floors throughout the apartment, making the beds, washing dishes, dusting the whole apartment, cleaning the kitchen, refrigerator and oven, cleaning the bathrooms and the rest of the apartment, and removing the trash. Plaintiff spent approximately at least one-fourth of her work-time each week performing general household cleaning duties.

47.     While her contract with Defendant specifically mentioned that she should be provided a private bedroom, Suarez was never given one. She was made to sleep on an aerobed at the living room, or on the couch at the living room. The only time she got to sleep on a real bed was after Mr. Rahul Scudder took the children with him to Florida on December 25, 2016.

48.     Although Defendant promised to pay Plaintiff at least $9.00 per hour and $13.50 per hour for overtime pay, she never paid Plaintiff properly and on time.

8

49.     In fact, Defendant did not pay Suarez any wages even though three weeks had already passed since Plaintiff started working for her.

50.     In late November 2016, Suarez had to beg Defendant Scudder to pay her wages as she needed to send money to her ailing mother in the Philippines.

51.     It was only on December 2, 2016 when Defendant Scudder paid Plaintiff her first wage, and only in the total amount of two hundred dollars ($200.00), in cash.

52.     About a week before Christmas in 2016, Suarez again begged Defendant to pay her wages as she wanted to send money to her children in the Philippines.

53.     Scudder, instead of paying Plaintiff her full and correct wages, paid Suarez only the amount of one hundred fifty dollars ($150.00). This was Plaintiff's second wage, and this wage was given on December 23, 2016.

54.     Suarez likewise begged Scudder to provide her with a Sim card so she could communicate to her husband in Abu Dhabi, UAE, and to her children in the Philippines.

55.     Defendant Scudder initially told Plaintiff that she could not get Plaintiff a Sim card because Plaintiff allegedly had no U.S. identification card.

56.     Plaintiff Suarez became depressed when she learned that she could not even communicate with her family.

57.     On Christmas Day in 2016, however, Defendant provided Suarez with a Sim card which she said could only be used to call people within the United States.

58.     At that time, Plaintiff Suarez knew of nobody else in the United States but the Scudder family. Plaintiff decided to use the Sim card to call her husband in Abu Dhabi – an overseas call. As a result, Defendant berated Plaintiff for making an overseas call, and told Plaintiff that she would deduct the cost of the overseas call from Plaintiff's wages.

59.     Suarez was about five months pregnant already during the Christmas season in 2016. She told Defendant that she needed to have pregnancy check-up appointments with a doctor. She asked if she could be paid her full wages because she also needed to prepare for the birth of her child.

60.     Defendant Scudder got angry at Plaintiff and even urged her to have the baby aborted. Defendant told Plaintiff that she could bring Plaintiff to a private doctor she knew who would vacuum out the baby. Defendant told Plaintiff that at Plaintiff's age, she should no longer be having any new babies.

61.     Plaintiff Suarez replied that she could not and would not have her baby aborted because of her fear in God, and that her faith would not allow her to abort her baby.

62.     Defendant Scudder got even angrier at Plaintiff and told Suarez that she would not pay for Suarez's pregnancy and child-birth expenses.

63.     Plaintiff Suarez became emotionally affected by her employment conditions.

64.     Despite not being paid properly and despite being pregnant, Suarez continued to work for Defendant Scudder as she had nowhere else to go.

65.     One time in early January 2017, Suarez decided to go to Woodside in Queens County, New York, which she learned was where a great concentration of Filipinos resided.

66.     Plaintiff needed to tell someone about her working conditions. So, upon arriving at the heart of the Filipino community in Woodside, Queens, Suarez introduced herself to another Filipino woman who, fortunately, was receptive to her cries for help.

67.     The other Filipino woman, named Gemma Castillo, having learned of Plaintiff's working conditions, gave Suarez some food and promised to give her some money whenever she happened to be in the Woodside area.

68.     Sometime in March 2017, Suarez again asked Defendant Scudder if she could pay her all of her earned wages. Suarez cried and begged to be paid her wages.

69.     Defendant Scudder angrily replied that Plaintiff allegedly did not deserve to be paid anything anymore as she was no longer working as a nanny, but just as a household servant. Defendant rationalized that inasmuch as her children were in Florida, Plaintiff was doing less work anyway, and that Plaintiff was also given free plane ticket to come to the United States, and that she helped Plaintiff get a B-1 visa, and that she was allegedly providing Plaintiff with free food and housing.

70.     Plaintiff could not do anything but to cry in front of Defendant.

71.     Defendant Scudder told Plaintiff to "stop the drama", and that if Suarez did not stop asking for her wages, Defendant threatened Suarez that she would report her to immigration authorities to be deported.

72.     In reply, Suarez told Defendant that she would rather go home to the Philippines since Defendant was not paying her anyway. Plaintiff told Defendant that Defendant had promised her many beautiful things when she was still in Abu Dhabi so that she would join Defendant and work for her in New York, but those promises turned out to be empty promises.

73.     Defendant Scudder responded that Plaintiff allegedly had no debt of gratitude to her. She also told Suarez that she would not allow her to go to the Philippines and release her because they allegedly had a one-year contract, and that if Suarez left, Defendant would look for her and file a case against her for breach of contract and demand that Suarez would reimburse her for her plane ticket and visa fees.

74.     Having heard Defendant's threats, Suarez became silent and just continued crying. She had to and did continue working for Scudder.

75.     Sometime in March 2017, in one of her pregnancy medical check-up appointments, Suarez met and befriended an American woman named Anne Meyer, who was a volunteer at the clinic. Ms. Meyer gave Plaintiff some clothes, canned baby milk, soap, shampoo, small crib, baby chair, and even a car seat for a baby.

76.     On April 4, 2017, Plaintiff Suarez gave birth. Ms. Meyer was there by her side.

77.     Ms. Meyer requested Defendant Scudder to provide Plaintiff with an assistant to help her during the first few days after her child delivery.

78.     On April 6, 2017, Plaintiff was discharged from the hospital and went back to Defendant's apartment in Great Neck, bringing with her the new-born baby.

79.     Even though Suarez was still weak, Defendant made her prepare their lunch. Defendant did not even give Suarez some time to recuperate before she ordered her to resume doing household duties.

80.     Two days later, Plaintiff's new-born baby kept on crying as there was no more milk to feed her with. All the cans of milk provided by Ms. Meyer had been used up.

81.     Plaintiff asked Defendant Scudder for some money, which would be her wages anyway, so she could buy milk for her baby.

82.     Scudder did not give Suarez any money, but told Suarez to simply boil water from the faucet, and when it cooled down, the water should serve as the baby's drink.

83.     Plaintiff Suarez became desperate and called up Ms. Meyer and Ms. Castillo for help. They responded with buying milk for the baby. In fact, Ms. Meyer even enrolled Plaintiff with the WIC program.

84.     On May 1, 2017, Defendant Scudder told Plaintiff to bring her baby to the Philippines as her (Defendant's) own children were allegedly coming back from Florida.

85.     Plaintiff Suarez immediately agreed to bring the baby to the Philippines, as she also wanted to escape from her working conditions.

86.     Defendant bought plane tickets for both Plaintiff and Plaintiff's baby, who both left for the Philippines on May 3, 2017.

87.     Suarez was not paid by Defendant Scudder her earned full wages when she left for the Philippines.

88.     Not long after Suarez arrived in the Philippines, Defendant Scudder communicated to her and asked her to come back to New York to resume her duties with her, as Defendant's children allegedly needed her (Plaintiff), and that Defendant also allegedly badly needed Plaintiff to testify in Defendant's behalf against Defendant's husband for domestic violence.

89.     As a woman, Plaintiff Suarez felt for Defendant because Plaintiff herself witnessed the violence Defendant Scudder suffered at the hands of her husband when they were all still residing in Abu Dhabi.

90.     So, even if Suarez did not really want to work for Defendant anymore, she somehow felt she needed to help Defendant with her domestic violence case against her husband because she knew it (the domestic violence) was indeed true.

91.     Plaintiff Suarez decided to return to work for Defendant, greatly in part because Defendant had promised that she would start paying Plaintiff her proper wages.

92.     Defendant Scudder told Plaintiff that Plaintiff could still come back to the United Stated with the B-1 visa that she had previously secured in Abu Dhabi, because it was still valid until October 18, 2018.

93.     Defendant Scudder reassured Plaintiff that she would pay Plaintiff her wages according to their contract.

94.     Suarez relied on Scudder's promise to pay her wages properly.

95.     Suarez, urged by her good human nature to help Scudder against an abusive husband, decided to return to New York, also in part, so she could testify for Defendant.

96.     On June 19, 2017, Suarez, with ambivalent feelings and with a heavy heart, returned to New York to resume working for Defendant. Defendant Scudder had earlier sent Suarez's plane ticket to leave Manila for New York.

97.     Upon her return to Great Neck, New York, Plaintiff Suarez was surprised to learn that the three young children were still in Florida, and still not in New York. So, there were no children to take care of.

98.     Suarez was also surprised when Scudder told her that she was not going to testify anymore in her domestic violence case against Mr. Rahul Scudder.

99.     Plaintiff Suarez realized that Defendant Scudder misrepresented the issue about the children having come back from Florida and the issue about the domestic violence testimony so that she would come back to New York to work for Defendant.

100.    Upon her return, Plaintiff's duties were concentrated mostly on cooking for Defendant, cleaning the kitchen and the whole apartment, and doing the laundry and ironing.

101.    Sometimes, Defendant sent Suarez to clean the nearby apartments of Defendant's close friends in Long Island.

102.    Sometime in the middle of July 2017, one of Defendant's close friends from Abu Dhabi arrived and stayed with Defendant until around the second week of August 2017. Plaintiff

Suarez had to serve also this friend of Defendant. She prepared meals, cleaned the room, and performed laundry and ironing services for Defendant's friend as well.

103.    Suarez worked more than 44 hours per week, and frequently more than 50 hours per week, as she had to wait and serve Defendant and her guests whenever she had visitors or parties at her Great Neck apartment.

104.    More than a month after Plaintiff Suarez came back to work for Defendant, and not having been paid any wages at all, she demanded her wages from Defendant.

105.    To Plaintiff's surprise, Defendant Scudder paid Plaintiff only three hundred dollars ($300.00), despite Defendant's promise when Plaintiff was still in the Philippines that Defendant would pay her according to their contract and pursuant to U.S. labor laws.

106.    Suarez realized that she was duped, yet a second time, by Defendant Scudder.

107.    Suarez tried a few more times asking Defendant to pay her full earned wages.

108.    But each time Plaintiff asked for her proper wages, Defendant countered that she could not pay her as she had earlier promised because Plaintiff was allegedly not working anymore as a nanny inasmuch as the children were in Florida.

109.    Defendant also threatened Plaintiff about escaping from her employment. She told Plaintiff that if Plaintiff left her employment, Defendant would allegedly report her to the police and to immigration authorities to be deported, and that she would also file a case against Plaintiff for violating their one-year employment contract. Defendant also threatened Plaintiff that she would demand that Plaintiff would pay for her attorney's fees and the court costs.

110.    Suarez got scared of Defendant's threats and feared the loss of her immigration status to stay and work in the United States. Plaintiff meekly kept silent and did not protest any further. She continued to work for Scudder.

111.    Although Plaintiff wanted to be paid according to their employment agreement and according to U.S. labor laws, Plaintiff did not want to lose her B-1 status and to be deported. Plaintiff felt that she had no choice but to continue working for Defendant in order to maintain her B-1 status.

112.    Not having any money at all, Suarez became even more afraid because of Defendant's threats, and thus, she was forced to continue working for Defendant.

113.    In fact, Suarez even assisted Scudder in transferring to her new apartment at 225 East 63rd Street, Apt. 2G, New York, NY 10065, on September 1, 2017.

114.    Plaintiff continued working for Defendant Scudder until she was informed by some well-meaning Filipino anti-trafficking and wage-hour advocates that she should not let herself become a slave of Defendant Scudder.

115.    On October 1, 2017, Plaintiff finally found the guts and left her slavery-like working conditions with Defendant Scudder.

116.    Plaintiff Suarez suffered emotional distress due to Defendant's coercive tactics resulting in her forced labor, and to her immigration status being put in jeopardy.

117.    The emotional effects suffered by Suarez included disrupted sleeping, nightmares, ongoing feelings of fear, difficulty developing trust, anxiety, depression, difficulty concentrating and stress.

118.    Although Plaintiff worked more than forty four hours each workweek, Defendant did not pay her time and a half for the extra hours beyond 44 each week. In fact, Defendant did not pay her anything at all for the extra hours.

119.    Defendant Scudder paid Plaintiff Suarez only the total amount of six hundred fifty dollars ($650.00), for all of her hours of work, spanning the two periods of employment: (a) from November 5, 2016 to May 3, 2017, and; (b) from June 19, 2017 to October 1, 2017.

120.    The three separate payments made by Defendant to Plaintiff were all cash payments, and Defendant did not provide Plaintiff with any wage statement.

121.    Scudder did not compensate Suarez at least the minimum wage for each of the first 44 hours of work per workweek that Suarez rendered to Defendant.

122.    Scudder also did not pay Plaintiff at the NYLL statutorily-required rate of one and one-half times her regular rate of pay, for any and all hours that Plaintiff worked per week in excess of forty-four.

123.    Scudder did not pay Plaintiff one additional hour of pay at the basic minimum hourly rate for all of the times that the length of the interval between the beginning and end of her workday - including working time plus time off for meals plus intervals off duty - was greater than 10 hours.

124.    Scudder did not keep accurate records of wages or of hours worked by the Plaintiff.

125.    On the occasions when Defendant paid Plaintiff, Defendant intentionally did not furnish Plaintiff with a wage statement that accurately listed the following:  the dates of work covered by the payment; Plaintiff's name; Employer's name; Employer's address and telephone number; Plaintiff's hourly rate of pay; Plaintiff's overtime rate of pay; and the basis for computing Plaintiff's rate of pay.  Instead, Defendant paid Plaintiff in cash.

126.    Defendant intentionally did not provide Plaintiff with a wage notice at the time of hire containing all of the following information:   Plaintiff's hourly rate of pay; Plaintiff's

overtime rate of pay; whether any allowances are claimed as part of the minimum wage; the regular rate of pay designated by the Employer; the name and physical address of the Employer; any "doing business as" names used by the Employer; and Employer's mailing address and telephone number(s).

127.    Defendant was also at all times aware of her legal obligations to pay Plaintiff overtime pay at the rate of one and one-half times her regular rate of pay for hours worked per week in excess of forty-four under the NYLL, as well as the minimum wage rate of pay for each hour worked under the FLSA and the NYLL.  In addition, Defendant was aware of her legal obligation to issue Plaintiff accurate wage statements on each payday and an initial wage notice in accordance with the NYLL.  Thus, her violations of the FLSA and the NYLL with respect to the Plaintiff were willful.

## FIRST CAUSE OF ACTION
### Trafficking Victims Protection Act of 2003 ("TVPA"), as amended
### Forced Labor, 18 U.S.C. §1589

128.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

129.    Plaintiff brings this claim against Defendant.

130.    This claim is brought under 18 U.S.C. §1595 of the Trafficking Victims Protection Act, as amended.

131.    Defendant subjected Plaintiff to forced labor in violation of 18 U.S.C. §1589.

132.    Defendant knowingly obtained Plaintiff's labor and services by subjecting Plaintiff to threats of serious harm, including deportation by immigration and law enforcement officials and/or loss of immigration status, and/or of being made a defendant in a purported breach of contract case, in violation of 18 U.S.C. §1589(2).

133.    By threatening Plaintiff with cancellation of her visa sponsorship and/or deportation, and/or by threatening her with a lawsuit for purported breach of contract, Defendant obtained the labor of Plaintiff through abuse and threatened abuse of law and the legal process, in violation of 18 U.S.C. §1589(3).

134.    Defendant caused Plaintiff to continue working and making herself available to work at her Great Neck residence, and then later at her Manhattan apartment, without proper wages, by threatening her with withdrawal of her visa sponsorship and/or deportation, and/or with a lawsuit for purported breach of contract.

135.    Defendant knowingly obtained Plaintiff's labor and services by using a scheme, plan and pattern intended to cause Plaintiff to believe that, if she did not continue working for the Defendant, she would suffer serious harm, in violation of 18 U.S.C. §1589(4).

136.    As a result of the above violations, Plaintiff suffered damages.

137.    Plaintiff is entitled to compensatory and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorney's fees.

### SECOND CAUSE OF ACTION
**Fair Labor Standards Act - Minimum Wages**

138.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

139.    Defendant engaged in a widespread pattern, policy and practice of violating the FLSA, as detailed in this Complaint.

140.    At all times relevant, Plaintiff was employed by an individual engaged in commerce and/or the production or sale of goods for commerce within the meaning of 29 U.S.C. §§ 201 *et seq*.

141.     At all times relevant, Plaintiff was or has been an employee within the meaning of 29 U.S.C. §§ 201 *et seq.*

142.     At all times relevant, Defendant was "employer" of Plaintiff, engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 201 *et seq.*

143.     The minimum wage provisions set forth in the FLSA, 29 U.S.C. §§ 201 *et seq.*, and the supporting federal regulations, apply to Defendant and protect the Plaintiff.

144.     Defendant failed to pay Plaintiff the minimum wages to which she was entitled under the FLSA.

145.     Defendant's unlawful conduct, as described in this Complaint, was willful and intentional.  Defendant was aware or should have been aware that the practices described in this Complaint were unlawful.  Defendant did not make a good faith effort to comply with the FLSA with respect to the compensation of the Plaintiff.

146.     As a result of Defendant's willful violations of the FLSA, Plaintiff suffered damages by being denied minimum wages in accordance with the FLSA in an amount to be determined at trial, and is entitled to recovery of such amount, liquidated damages, prejudgment interest, attorney's fees, costs, and other compensation pursuant to 29 U.S.C. §§ 201 *et seq.*

### THIRD CAUSE OF ACTION
### Fair Labor Standards Act - Overtime Wages

147.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

148.     The overtime wage provisions set forth in the FLSA, 29 U.S.C. §§ 201 *et seq.*, and the supporting federal regulations, apply to Defendant and protect the Plaintiff.

149.   Defendant failed to pay Plaintiff the premium overtime wages to which she is entitled under the FLSA for all hours worked beyond 40 per workweek.

150.   Defendant's unlawful conduct, as described in this Complaint, was willful and intentional.  Defendant was aware or should have been aware that the practices described in this Complaint were unlawful.  Defendant did not make a good faith effort to comply with the FLSA with respect to the compensation of the Plaintiff.

151.   As a result of Defendant's willful violations of the FLSA, Plaintiff suffered damages by being denied overtime compensation in an amount to be determined at trial, and is entitled to recovery of such amount, liquidated damages, prejudgment interest, attorney's fees, costs, and other compensation pursuant to 29 U.S.C. §§ 201 *et seq.*

### FOURTH CAUSE OF ACTION
### New York Labor Law ("NYLL") Minimum Wage, §652

152.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

153.   The minimum wage provisions of Article 19 of the New York Labor Law and the supporting New York State Department of Labor Regulations apply to Defendant, and protect the Plaintiff.

154.   Defendant failed to pay Plaintiff the minimum hourly wages to which she was entitled under the NYLL and the supporting New York State Department of Labor Regulations.

155.   Pursuant to the NYLL, Article 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor Regulations, Defendant was required to pay Plaintiff the full minimum wage at a rate of $9.00 per hour for regular hours worked from November 6, 2016 through December 30, 2016, and the minimum wage rate of $9.70 from December 31, 2016 through October 1, 2017.

156.    Through her knowing or intentional failure to pay minimum hourly wages to the Plaintiff, Defendant willfully violated the NYLL, Article 19, §§ 650 *et seq*., and the supporting New York State Department of Labor Regulations.

157.    Due to Defendant's willful violations of the NYLL, Plaintiff is entitled to recover from Defendant her unpaid minimum wages, liquidated damages as provided for by the NYLL, reasonable attorney's fees, costs, and pre-judgment and post-judgment interest.

<u>**FIFTH CAUSE OF ACTION**</u>
**New York Labor Law ("NYLL) Unpaid Overtime, Article 19**

158.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

159.    Defendant did not pay Plaintiff the proper overtime wages for all the time that she was suffered or permitted to work each workweek beyond 44 hours.

160.    During her employment, Plaintiff generally worked an average of between fifty (50) and one hundred five (105) hours per week.

161.    During such workweeks, Defendant did not compensate Plaintiff at time and a half the full minimum wage rate for all of the overtime hours she worked.

162.    The overtime wage provisions of Article 19 of the New York Labor Law and its supporting regulations apply to Defendant, and protect Plaintiff.

163.    Defendant failed to pay Plaintiff the premium overtime wages to which she was entitled under the NYLL and the supporting New York State Department of Labor Regulations for all hours worked beyond 44 hours per workweek.

164.    Defendant failed to keep, make, preserve, maintain and furnish accurate records of time worked by the Plaintiff.

165.    Through her knowing or intentional failure to pay Plaintiff overtime wages for hours worked in excess of 44 hours per workweek, Defendant willfully violated the NYLL, Article 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor Regulations.

166.    Due to Defendant's willful violations of the NYLL, Plaintiff is entitled to recover from Defendant her unpaid overtime wages, liquidated damages as provided for by the NYLL, reasonable attorney's fees and costs of the action, and pre-judgment and post-judgment interest.

### SIXTH CAUSE OF ACTION
### New York Labor Law - Spread-of-Hours Pay

167.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

168.    Defendant failed to pay Plaintiff additional compensation of one hour's pay at the basic minimum hourly wage rate for each day that the length of the interval between the beginning and end of her workday -- including working time plus time off for meals plus intervals off duty -- was greater than 10 hours.

169.    Through her knowing or intentional failure to pay Plaintiff spread-of-hours pay, Defendant willfully violated the NYLL, Article 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor Regulations.

170.    Due to Defendant's willful violations of the NYLL, Plaintiff is entitled to recover from Defendant her unpaid spread-of-hours wages, liquidated damages as provided for by the NYLL, reasonable attorney's fees, costs and pre-judgment and post-judgment interest.

### SEVENTH CAUSE OF ACTION
### New York Labor Law - Failure to Provide Proper Annual Wage Notice

171.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

172.     Defendant willfully failed to furnish Plaintiff with wage notice as required by NYLL, Article 6, § 195(1), in English or in the language identified by Plaintiff as her primary language, at the time of hiring, with the notice containing:  the rate of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay day designated by the employer in accordance with NYLL, Article 6, § 191; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the Commissioner deems material and necessary.

173.     Through her knowing or intentional failure to provide Plaintiff with the wage notice required by the NYLL, Defendant willfully violated NYLL, Article 6, §§ 190 *et seq*., and the supporting New York State Department of Labor Regulations.

174.     Due to Defendant's willful violations of NYLL, Article 6, § 195(1), Plaintiff is entitled to statutory penalty of fifty dollars ($50) for each day that Defendant failed to provide Plaintiff with wage notices, to a maximum of five thousand dollars ($5,000), plus reasonable attorney's fees, costs, and injunctive and declaratory relief, as provided for by NYLL, Article 6, § 198(1-b).

### EIGHTH CAUSE OF ACTION
### New York Labor Law - Failure to Provide Proper Wage Statements

175.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

176.     Defendant willfully failed to furnish Plaintiff with statements with every payment of wages as required by NYLL, Article 6, § 195(3), listing:  the dates of work covered by that

payment of wage; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; net wages; the regular hourly rate or rates of pay; the overtime rate or rates of pay; and the number of regular and overtime hours worked.

177.    Through her knowing or intentional failure to provide Plaintiff with the accurate wage statements required by the NYLL, Defendant willfully violated the NYLL, Article 6, §§ 190 *et seq.*, and the supporting New York State Department of Labor Regulations.

178.    Due to Defendant's willful violations of the NYLL, Article 6, § 195(3), Plaintiff is entitled to statutory penalty of two hundred fifty dollars ($250) for each workweek that Defendant failed to provide Plaintiff with accurate wage statements, to a maximum of five thousand dollars ($5,000), plus reasonable attorney's fees, costs, and injunctive and declaratory relief, as provided for by the NYLL, Article 6, § 198(1-d).

## NINTH CAUSE OF ACTION
### Breach of Contract

179.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

180.    Plaintiff was hired in October 2016 to work as a domestic worker of the Defendant. Defendant offered to pay Plaintiff $9.00 per hour for each hour worked as a nanny, and to pay Plaintiff 150% of the normal hourly wage for each hour worked more than 44 hours in one week.

181.    Plaintiff accepted the offer.

182.    Plaintiff also accepted the offer by her performance of her domestic services.

183.    In fact, the parties entered into an employment agreement dated October 13, 2016.

184.   By failing to pay Plaintiff $9.00 per hour for each hour worked, and by failing to pay Plaintiff $13.50 for each hour worked in excess of 44 hours per workweek, Defendant breached her contract with the Plaintiff.

185.   Defendant also breached her duty of good faith and fair dealing by failing to keep track of the time Plaintiff spent performing her services as a domestic employee.

186.   Plaintiff did not breach any of her obligations under the employment agreement with the Defendant.

187.   As a direct and proximate result of Defendant's breaches of the employment agreement as alleged here, Plaintiff was damaged in an amount to be determined at trial, plus court costs, prejudgment interest, and attorney's fees.

## TENTH CAUSE OF ACTION
### Fraudulent Inducement

188.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

189.   Defendant knowingly made misrepresentations and material omissions of fact, which were false to Plaintiff regarding Plaintiff's employment, work responsibilities and compensation to the effect that she would be paid in accordance with laws of the United States.

190.   The representations and substantive omissions by Defendant, as alleged herein, including the nature of work schedules and compensation rate of the Plaintiff, were material and untrue.

191.   Defendant made or caused to be made the material misrepresentations and omissions identified above with knowledge or belief of their falsity or with reckless disregard for their truth.

192.    Defendant made or caused to be made the material misrepresentations and omissions with the intent to induce the Plaintiff to rely upon them so she would agree to be sponsored by Defendant to come and work for Defendant in New York and to continue to work for her, and/or to come back and work for Defendant.

193.    In justifiable reliance on the material misrepresentations and omissions made or caused to be made by Defendant, Plaintiff agreed to be sponsored by Defendant to come to work for Defendant in New York, and/or to come back and resume working for Defendant.

194.    Had Plaintiff known of the material misrepresentations and omissions made or caused to be made by Defendant, Plaintiff would have not allowed herself to be sponsored by Defendant through the visa sponsorship process, and/or Plaintiff would have not allowed herself to come back to New York and to resume working for Defendant.

195.    Because of Defendant's abuse of her position of trust as Plaintiff's visa sponsor, Plaintiff, even in the exercise of reasonable due diligence, was ignorant of the true facts concerning the nature of her B-1 sponsorship and employment, and believed that Defendant was conducting herself honestly and properly with her. Plaintiff accordingly relied upon Defendant's conduct, and acted in such reliance as described above, all to her injury.

196.    Defendant's behavior constitutes an intentional fraud.

197.    As a direct and proximate result of Defendant's acts, Plaintiff was damaged in an amount to be determined at trial, but which amount is believed to be no less than seventy five thousand dollars ($75,000).

198.    The foregoing acts and omissions by Defendant constitute oppressive, malicious, and deceptive conduct justifying an award to Plaintiff of punitive and exemplary damages, attorney's fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief as against Defendant:

1.      Compensatory and punitive damages in such amount as may be determined by the jury for Defendant's unlawful conduct of forced labor;

2.      Unpaid minimum wages, overtime pay, and an additional and equal amount as liquidated damages pursuant to the FLSA and the supporting United States Department of Labor Regulations;

3.      Issuance of a declaratory judgment that the practices complained of in this Complaint are unlawful under the NYLL, Article 6, §§ 190 *et seq.*, NYLL, Article 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor Regulations;

4.      Unpaid minimum wages, overtime pay, spread-of-hours pay, and liquidated damages permitted by law pursuant to the NYLL and the supporting New York State Department of Labor Regulations;

5.      Statutory penalty of fifty dollars ($50) for each day that Defendant failed to provide Plaintiff with the written wage notice at the time of hiring, or to a maximum of five thousand dollars ($5,000), as provided for by NYLL, Article 6, § 198(1-b);

6.      Statutory penalty of two hundred fifty dollars ($250) for each workweek that Defendant failed to provide Plaintiff with proper wage statements, or to a maximum of five thousand dollars ($5,000), as provided for by NYLL, Article 6, § 198(1-d);

7.      Pre-judgment and post-judgment interest;

8.      An injunction requiring Defendant to pay all statutorily required wages and cease the unlawful activity described herein pursuant to the NYLL;

9.      Reasonable attorney's fees and costs of the action; and

10.     Such other relief as this Court shall deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on each and every claim set forth herein.

Dated: Woodside, New York.
       October 15, 2018.

                              Yours, etc.

                              LAW OFFICE OF FELIX VINLUAN

                              By: _____
                              Felix Q. Vinluan (FV6788)
                              69-10 Roosevelt Avenue, 2nd Floor
                              Woodside, NY11377
                              Tel. No. 718-478-4488
                              Fax No. 718-478-4588
                              Email: fqvinluan@yahoo.com
                              *Attorneys for the Plaintiff*

## **VERIFICATION**

STATE OF NEW YORK   )
COUNTY OF QUEENS   ) S.S.

I, ANILA S. SUAREZ, of legal age, a non-immigrant presently residing in Queens County, State of New York, after having been sworn in accordance with law, hereby state that I am the Plaintiff in the within Action/Complaint.  I have read the foregoing Complaint and know the contents thereof.  The contents are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

_____
ANILA S. SUAREZ

SUBSCRIBED AND SWORN to before me this _15th_ day of October 2018.

_____
Notary Public

FELIX Q. VINLUAN
Notary Public, State of New York
No. 02VI6129101
Qualified in Nassau County
Commission Expires June 20, 2009 21

30